IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 16-00048-01-CR-W-DGK |
| | ) | |
| ANTONIO M. SLATER, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

This matter is currently before the Court on defendant Slater's Motion to Suppress Evidence. (Slater Mot. to Suppress Evidence; Doc. #33.) For the reasons set forth below, it is recommended that the motion be denied.

I. INTRODUCTION

On February 4, 2016, the grand jury returned a one-count indictment against defendant Antonio M. Slater. The indictment charges that on or about November 28, 2015, defendant, having been convicted of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed a firearm.

On October 25, 2018, an evidentiary hearing was held on defendant's motion to suppress. Defendant Slater was represented by Assistant Federal Public Defender Stephen C. Moss. The Government was represented by Assistant United States Attorney Matthew A. Moeder. The Government called Detective Kari Mutschler and Officer Timothy Griddine of the Kansas City, Missouri Police Department as witnesses. The defense called no witnesses to testify.

II. FINDINGS OF FACT

On the basis of the evidence adduced at the evidentiary hearing, the undersigned submits

the following proposed findings of fact:

1. On November 28, 2015, at approximately 7:28 p.m., a 911 call was made to report an armed robbery that had just taken place. (Tr. at 5, 8; Gov. Exh. 2.) The caller/victim identified himself by name, gave his telephone number, his location (12th and Prospect), and that he was in a black Kia Sorrento. (Tr. at 6, 11.) The suspects were described as a black male wearing a brown hoodie and dark pants, and a black male wearing a brown hoodie and dark pants, armed with a black handgun. (Tr. at 10; Gov. Exh. 2.) This description of the suspects was broadcast to all of the officers in the area at 7:31 p.m. (Tr. at 10, 50; Gov. Exh. 2.) At 7:32 p.m., dispatch announced that the location had changed to 12th and Brooklyn, and that the suspects were on foot. (Tr. at 11; Gov. Exh. 2.) At 7:33 p.m., dispatch announced that the suspects had taken two cell phones and a wallet. (Tr. at 11; Gov. Exh. 2.)

2. At approximately 7:33 p.m., Detective (then Officer) Kari Mutschler and her partner were dispatched on the armed robbery in progress call. (Tr. at 3-5, 12; Gov. Exh. 2.) At approximately 7:37 p.m., Detective Mutschler and her partner contacted the 911 caller/victim at 12th and Brooklyn. (Tr. at 5, 11, 14.) There were two victims. (Tr. at 15.) The victims advised the officers that they posted an ad on Craigslist to sell an iPhone 6. (Tr. at 16.) A person contacted them by phone and requested that they meet at 1015 Garfield because the person wanted to buy the phone. (Tr. at 16.) The victims were parked near 11th and Garfield when a black male approached the car, pointed a handgun at the victim's head and stated, "Give me everything you got." (Tr. at 16.) The victim said he told the black male he did not have anything. (Tr. at 16.) The black male then reached into the car, grabbed an iPhone 6 that was in the center console and the victim's cell phone which was between his legs. (Tr. at 16.) The victims told the officers that after the robbery, they drove around to make sure that the suspects were not in the area and ended up at 12th and Brooklyn. (Tr. at 20.)

3. The victims gave a description of the suspects to Detective Mutschler that differed slightly from the description that had been dispatched. (Tr. at 16.) The victims described the suspects as two black males, one wearing a black hoodie and dark sweat pants and one wearing a brown hoodie and dark pants. (Tr. at 16, 23-24; Def. Exh. 1.)

4. Officer Timothy Griddine testified that he heard dispatch broadcast a robbery in the area. (Tr. at 32.) Officer Griddine and his partner, Officer Charles Hill, were about four blocks west of the reported location of the robbery. (Tr. at 34-35.) Officer Griddine testified that he thought the initial description of the suspects was two black males, one wearing brown and armed with a gun. (Tr. at 33.) When Officer Griddine heard the dispatch, he began to canvass the area, looking for "anybody moving around, anybody fitting that description." (Tr. at 34-35.) At

2

that time, Officer Griddine had no information as to the height, weight, age, or other physical characteristics of the suspects. (Tr. at 58-59.) As Officer Griddine turned eastbound on 10th Street at Woodland, he saw two black males walking toward him. (Tr. at 36-37.) One male was wearing a brown hoodie, which got Officer Griddine's attention. (Tr. at 36-37.) Officer Griddine testified that he believed the gentleman fit the description of the robbery suspect wearing tan or brown. (Tr. at 52-53.) Officer Griddine does not recall what the second subject was wearing, other than that it was dark clothing. (Tr. at 56.) Officer Griddine thought these two individuals were in close proximity to the robbery and that they could very well be the suspects. (Tr. at 37.) Officer Griddine testified that the distance between where the robbery took place and where he saw the two subjects was about two and one-half city blocks. (Tr. at 46-47.) One additional reason Officer Griddine gave for stopping the two subjects was the fact that they were walking away from the scene of the crime, rather than walking towards it. (Tr. at 61.)

5. Officer Griddine jumped out of the patrol car with his firearm drawn. (Tr. at 37.) Officer Griddine testified that he drew his firearm because the call had stated that the suspects were armed with a handgun. (Tr. at 37.) Officer Griddine told the two individuals to stop and they did stop. (Tr. at 37-38.) Officer Griddine first frisked the individual wearing the brown hoodie, Anthony Caldwell. (Tr. at 38-39.) Officer Griddine explained that he was investigating a robbery. (Tr. at 39.) Officer Griddine found nothing illegal on Mr. Caldwell's person. (Tr. at 39.) Officer Griddine next attempted to frisk the second individual, defendant Antonio Slater. (Tr. at 39.) As Officer Griddine's hand made contact with a gun in Slater's right pocket, Slater lowered his arm and his hand came down over Griddine's hand. (Tr. at 40, 42.) Officer Griddine believed that Slater was either trying to remove Griddine's hand or trying to get away. (Tr. at 42.) As Officer Griddine was struggling with Slater, Officer Hill requested back-up. (Tr. at 42.) The call for back-up went out at approximately 7:40 p.m. (Tr. at 12, 49-50; Gov. Exh. 2.) Officer Hill, as well as other officers who had responded to the call for back-up, assisted Officer Griddine in retrieving the handgun from Slater's pocket and then in securing Slater. (Tr. at 41, 43.) One of the officers had to taze Slater to immobilize him so the officers could get him handcuffed. (Tr. at 43.) As the officers were struggling with Slater, a glass vial fell out of Slater's pocket. (Tr. at 45.) The glass vial contained an amber liquid that Officer Griddine believed to be PCP. (Tr. at 45; Def. Exh. 2.) When asked why he felt he needed to frisk the second subject after finding nothing in the frisk of the first subject, Officer Griddine responded:

> Still had two subjects, close proximity of a robbery that just came out within three minutes, and they're just several blocks away from where the offense occurred. Usually there's a party armed. I don't know which one had the gun. So, I conducted a frisk the same way

3

>   with this gentleman because I was investigating the subjects might
>   have been involved with the robbery.

(Tr. at 41.)

6. Both subjects were identified and checked through the computer. (Def. Exh. 2.) Defendant Slater responded as a convicted felon for multiple offenses. (Def. Exh. 2.) The amber liquid field-tested positive for PCP. (Def. Exh. 2.) Defendant Slater was arrested for possession of a controlled substance and for the weapons law violation. (Def. Exh. 2.) During a search of defendant Slater's person prior to transporting him, officers discovered ammunition and More cigarettes, which Officer Griddine testified are known to be used with PCP. (Tr. at 45; Def. Exh. 2.) It was determined that neither defendant Slater nor Mr. Caldwell were involved in the reported armed robbery. (Tr. at 59.)

7. Detective Mutschler described the area where the robbery took place as "very crime-ridden." (Tr. at 18.) Detective Mutschler testified that the area is economically depressed and predominantly African-American. (Tr. at 22.) Officer Griddine testified that the residents in this area were predominantly African-American and that it was not unusual to see black persons walking in the area. (Tr. at 51.) Detective Mutschler advised that the police have a lot of calls for service in this area, such as thefts from automobiles, burglaries, assaults, shootings, and robberies. (Tr. at 18.) Detective Mutschler further advised that there had been a string of robberies where Craigslist was used as a way to contact victims and draw those victims to this area. (Tr. at 19.) Officer Griddine also testified that prior to this robbery, there had been numerous incidents where people were supposed to meet at 1015 Garfield to buy items off of Craigslist, and when they showed up at that location, they were robbed. (Tr. at 34.)

## III. DISCUSSION

Defendant Slater seeks to suppress all evidence, arguing the evidence resulted from an unlawful seizure. He provided the following argument in support of his motion:

>   The stop and frisk of Mr. Slater constitutes a detention that must be justified at its inception by reasonable suspicion that he was involved in criminal activity. …
>
>   Police did not observe Mr. Slater or Caldwell engaged in any suspicious, much less criminal, activity. While it is true that both Mr. Slater and Caldwell are black men that were walking about three-fourths of a mile from the reported robbery, the Fourth Amendment requires more to justify their forcible detention.

4

(Slater Mot. to Suppress Evidence at 3-4; Doc. #33.)

A. <u>The Constitutionality of the Stop</u>

Both investigative stops and arrests are seizures. However, an investigative stop need only be supported by a reasonable, articulable suspicion that criminal activity may be afoot, whereas an arrest must be supported by probable cause. *See Terry v. Ohio*, 392 U.S. 1, 25-31 (1968). In determining whether an officer had reasonable suspicion to conduct an investigative stop, the court must look at the totality of the circumstances to see whether the detaining officer had a particularized and objective basis for suspecting legal wrongdoing. *See United States v. Montgomery*, 828 F.3d 741, 743-44 (8th Cir. 2016).

The record in this case establishes that at approximately 7:28 p.m., a 911 call was made to report an armed robbery that had just taken place. (Fact No. 1.) The caller/victim identified himself by name, gave his telephone number, his location, and a description of the car he was in. (*Id.*) At approximately 7:31 p.m., dispatch broadcast the call, giving a description of the suspects as two black males wearing brown hoodies, dark pants, and armed with a black handgun. (*Id.*) At 7:32 p.m., dispatch announced that the suspects were on foot. (*Id.*) Officer Timothy Griddine heard dispatch broadcast a robbery in the area. (Fact No. 4.) Officer Griddine and his partner were about four blocks west of the reported location of the robbery. (*Id.*) They began to canvass the area, looking for "anybody moving around" who fit the description of two black males, one wearing brown. (*Id.*) Officer Griddine saw two black males walking toward him, and one male was wearing a brown hoodie. (*Id.*) Officer Griddine thought these two individuals could very well be the suspects, given the close proximity to the location of the robbery, the short time that had elapsed, and the fact that the individuals were walking away from the scene of the crime, rather

5

than walking towards it. (Fact Nos. 4 and 5.) Officer Griddine stopped the two subjects to investigate the reported robbery. (Fact No. 5.)

The Court finds that Officer Griddine had a reasonable, articulable suspicion that the two subjects he stopped were involved in the reported robbery given the description of the suspects as two black males wearing brown hoodies and dark pants who were on foot (defendant Slater and Mr. Caldwell were black males, Caldwell was wearing a brown hoodie, and Slater and Caldwell were walking), the location of the robbery (the stop took place approximately two and one-half blocks from the crime scene), the timing of the stop (just minutes after the robbery took place), and the direction that the subjects were walking (away from the crime scene). Thus, the Court finds that Officer Griddine was justified in conducting an investigative stop. *See United States v. Quinn*, 812 F.3d 694, 698 (8th Cir. 2016)("a person's temporal and geographic proximity to a crime scene, combined with a matching description of the suspect,[1] can support a finding of reasonable suspicion"); *United States v. Roberts*, 787 F.3d 1204, 1209-10 (8th Cir. 2015)(officer had reasonable suspicion to stop defendant even though clothing defendant was wearing did not match description given by witnesses where defendant's vehicle matched description given of suspect's vehicle and close temporal and physical proximity to reported crime).

B.  The Seizure of Defendant Slater

"[A] police officer may take steps reasonably necessary to protect his or her personal safety and the safety of others and to maintain the status quo of a situation while verifying or dispelling

---

[1] In *Quinn*, the defendant argued that while he was a white male and the suspects were white males, he did not match the suspects' descriptions in that he was wearing a dark t-shirt whereas one of the suspects wore a white t-shirt and the other a blue hooded sweatshirt. 812 F.3d at 698. The court noted that a sweatshirt easily could be discarded by a fleeing suspect. *Id.* at 699 n. 2.

suspicion in a short period of time." *United States v. Seelye*, 815 F.2d 48, 50 (8th Cir. 1987)(citing *United States v. Jones*, 759 F.2d 633, 636-37 (8th Cir.), *cert. denied*, 474 U.S. 837 (1985)). A police officer may conduct a pat-down search of the suspect during an investigative stop if the officer has reason to believe that such person might be armed and dangerous. *See Terry v. Ohio*, 392 U.S. 1, 30 (1968). Protective measures also allow for the use of handcuffs. *See United States v. Morgan*, 729 F.3d 1086, 1091 (8th Cir. 2013)("[p]olice officers reasonably may handcuff a suspect during the course of a *Terry* stop to protect their personal safety"); *United States v. Walker*, 555 F.3d 716, 721 (8th Cir. 2009); *United States v. Martinez*, 462 F.3d 903, 907 (8th Cir. 2006), *cert. denied*, 549 U.S. 1272 (2007).

Given Officer Griddine's reasonable suspicion that the two subjects he stopped had just been involved in an armed robbery, he had a credible concern for officer safety. Officer Griddine's frisk of the two subjects was proper as Griddine had reason to believe that the subjects might be armed and dangerous. As Officer Griddine's hand made contact with a gun in Slater's right pocket, Slater lowered his arm and his hand came down over Griddine's hand. (Fact No. 5.) The officers struggled with Slater, who was eventually tazed and handcuffed. (*Id.*) The Court finds that the actions taken by the officers were necessary to protect the personal safety of the officers and others and to maintain the status quo while investigating whether the subjects were involved in the reported armed robbery. No constitutional violation took place.

C.     The Arrest of Defendant Slater

A handgun and PCP were found on defendant Slater's person. (Fact No. 5.) When officers ran Slater's information through the computer, it was determined that he was a convicted felon. (Fact No. 6.) Defendant Slater was arrested for possession of a controlled substance and

7

for the weapons law violation.   (Fact No. 6.)   There was no constitutional violation.

D.     Fruit of the Poisonous Tree

Finally, defendant Slater argues that because the evidence against him was obtained as a direct result of an unreasonable stop and detention in violation of the Fourth Amendment, the evidence should be suppressed as fruit of the poisonous tree.   (Slater Mot. to Suppress Evidence at 4-5; Doc. #33.)   Under the fruit of the poisonous tree doctrine, the exclusionary rule bars the admission of evidence obtained directly or indirectly through the exploitation of police illegality. *See Wong Sun v. United States*, 371 U.S. 471, 484-88 (1963).   As set forth above, the Court finds that the investigative stop and the seizure of defendant Slater were lawful.   Therefore, defendant Slater's fruit of the poisonous tree argument must fail.

## IV.   CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendant Slater's Motion to Suppress Evidence (Doc. #33).

Counsel are reminded they have fourteen days in which to file any objections to this Report and Recommendation.   A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

 */s/ Lajuana M. Counts*
Lajuana M. Counts
United States Magistrate Judge